

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 20, 2024**

United States Bankruptcy Judge

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 24-30017-sgj |
| **1NONLY PHIMAR LLC,** *et al.*[1] | § | |
| | § | **Chapter 11** |
| Debtors. | § | (Jointly Administered) |

### ORDER GRANTING DEBTORS' MOTION TO SELL DEBTORS' ASSETS
### PURSUANT TO SECTIONS 105(a), 363, AND 365 OF
### THE BANKRUPTCY CODE AND BANKRUPTCY RULES 6004 AND 6006

Upon consideration of the *Motion to Sell Debtors' Assets Pursuant to Sections 105(a), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 6004 and 6006* (the "**Sale Motion**")[2], filed by 1Nonly PhiMar LLC ("**1NOnly Phimar**") and PhiMars Square, LLC ("**Phimars Square**," and collectively with 1NOnly Phimar, the "**Debtors**"), debtors and debtors-in-possession in the above

---

[1] The Debtors in these chapter 11 cases are 1Nonly PhiMar, LLC (the last four digits of its federal tax identification number are 4226) and PhiMars Square, LLC (the last four digits of its federal tax identification number are 3404).

[2] Capitalized terms not otherwise defined herein are to be given the meanings ascribed to them in the Sale Motion or the PSA, as applicable.

**ORDER GRANTING DEBTORS' MOTION TO SELL DEBTORS' ASSETS**
**PURSUANT TO SECTIONS 105(A), 363, AND 365 OF THE BANKRUPTCY**
**CODE AND BANKRUPTCY RULES 6004 AND 6006** **PAGE 1**

referenced bankruptcy case, and this Court having determined that the relief requested in the Sale

Motion is in the best interest of the Debtors, their estates, their creditors, and other parties in

interest, and after due deliberation thereon, and good and sufficient cause appearing therefore,

including for the reasons stated on the record at the hearing seeking approval of the Sale and Sale

Motion (the "**Sale Hearing**") and the evidence presented:

### IT IS HEREBY FOUND AND DETERMINED THAT:[3]

A.      The Court has jurisdiction to hear and determine the Sale Motion and to grant the

relief requested in the Sale Motion pursuant to 28 U.S.C. § 157 and 1334. Venue of these Chapter

11 Cases and the Sale in this district is proper under 28 U.S.C. §§ 1408 and 1409. This is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2). The Court has the authority to enter this Order

pursuant to 11 U.S.C. §§ 363(b) and (f).

B.      The statutory and legal predicates for the relief requested in the Sale Motion are

Sections 105 and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101 - 1532 (as amended,

the "**Bankruptcy Code**"), and Rules 2002, 6004, 6006, 9006, and 9014 of the Federal Rules of

Bankruptcy Procedure (the "**Bankruptcy Rules**").

C.      The Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy

Code on January 1, 2024 (the "**Petition Date**").

D.      The Debtors own good, sufficient, and marketable title to the Assets, subject to any

and all claims, liens, encumbrances, and interests as may otherwise exist (all such claims, liens,

encumbrances and interests, the "**Interests**"). Pursuant to all applicable bankruptcy and non-

bankruptcy law, the Debtors have the ability and power to transfer title of the Assets.

---

[3] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of
fact to the fullest extent of the law. *See* FED. R. BANKR. P. 7052.

E.      On March 6, 2024, the Debtors filed the Sale Motion by which they sought, among other things, an order (a) authorizing a sale of the Assets free and clear of all Interests (other than as set forth in the proposed Asset Purchase Agreement), and (b) the assumption and assignment of executory contracts and unexpired leases and rights thereunder, as more fully set forth in the Sale Motion.

F.      The Debtors served the Sale Motion and notice of the Sale Hearing (the "**Sale Notice**") by (a) first class United States Mail, postage prepaid, on (i) the parties identified in the Master Service List (who do not receive electronic notice) at the addresses set forth therein; (ii) the parties listed on the Creditor Matrix filed in these Cases; (iii) the parties that have filed proofs of claim in these cases at the addresses set forth in the respective proofs of claim; (iv) all parties that have requested notice and/or filed a notice of appearance in this case; and (vi) each of the entities listed as parties or counter-parties on unexpired leases listed on Exhibit B to the Sale Motion; and (b) the Court's electronic transmission facilities upon all parties receiving notice via that method.

G.      Due, sufficient, adequate, and appropriate notice of the Sale Motion and Sale Notice was provided to all parties-in-interest in the Bankruptcy Case.

H.      The notice given by the Debtors of the Sale Motion and the Sale Hearing constitutes good and sufficient notice of the relief granted by this Order and no further notice is required. The Court finds that the scope and manner of notice and service to be proper, timely, adequate, and sufficient in accordance with Bankruptcy Code §§ 105(a), 363, and 365 and Bankruptcy Rules 2002, 6004, 6006, 6007, and 9014. A reasonable opportunity, fully consistent with due process, to object or be heard regarding the relief granted by this Order has been afforded to those parties entitled to notice pursuant to Bankruptcy Rule 6004(a).

I.      Time is of the essence with respect to the Closing of the Sale of the Assets, and to the extent that the relief provided herein is not immediately granted, the Debtors and their estates will suffer immediate and irreparable harm. Accordingly, the waiver of any stay of this Order is appropriate and in the best interest of the Debtors' estates.

J.      The Purchaser and the Debtors request approval of the sale of the Debtors' Assets pursuant to the Purchase and Sale Agreement and all agreements required thereby (collectively, the "**PSA**"). A copy of the PSA is attached hereto as **Exhibit 1.**

K.      Other parties have had a reasonable opportunity to make a higher or otherwise better offers to purchase the Assets, and the Debtors have determined that the Purchaser submitted the highest and best offer for the Assets. The Debtors' determination that the PSA constitutes the highest and best offer for the Assets constitutes a valid and sound exercise of the Debtors' business judgment. The Court's approval of the Sale Motion, the PSA, and the transaction(s) contemplated therein maximizes the Debtors' recovery for the Assets and thus is in the best interests of the Debtors and their estates, creditors, and all other parties in interest.

L.      The Debtors have full power and authority to execute the PSA and all other documents referenced in or contemplated by the PSA or that are necessary or appropriate to effectuate the Sale as contemplated under the PSA.

M.      All actions contemplated by the PSA have been duly and validly authorized by all necessary action of the Debtors, and the Debtors have the full power and authority to consummate the transactions contemplated by the PSA. No further consents or approvals, other than entry of this Order, are required for the Debtors or Purchaser to consummate the transactions contemplated in the PSA.

N.      The Debtors and Purchaser negotiated, proposed, and entered into the PSA without collusion, in good faith, and from arms'-length bargaining positions.

O.      Purchaser is not an "insider" or "affiliate" of the Debtors as those terms are defined in Sections 101(31) and 101(2) of the Bankruptcy Code. Neither the Debtors nor Purchaser have engaged in any conduct that would cause or permit the PSA to be avoided or costs or damages to be imposed under Section 363(n) of the Bankruptcy Code.

P.      Purchaser is purchasing the Assets in good faith and is a good faith purchaser within the meaning of Section 363(m) of the Bankruptcy Code. Purchaser has at all times proceeded in good faith in connection with all aspects of the Sale. Purchaser recognized that the Debtors were free to deal with any other party interested in acquiring the Assets. Accordingly, Purchaser is entitled to all of the protections afforded under Section 363(m) of the Bankruptcy Code, including in the event this Sale Order or any portion thereof is reversed or modified on appeal, and Purchaser has otherwise proceeded in good faith in all respects in connection with the Sale specifically and in this Bankruptcy Case generally.

Q.      The PSA was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

R.      The consideration provided by Purchaser pursuant to the PSA (i) is fair and adequate, (ii) is the highest or otherwise best offer for the Assets, (iii) will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative, and (iv) constitutes reasonably equivalent value and fair consideration (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, and Section 548 of the Bankruptcy Code) and fair consideration under the Bankruptcy Code and under

applicable state law. The PSA was not entered into, and the Sale is not being consummated, for

the purpose of hindering, delaying, or defrauding creditors of the Debtors under the Bankruptcy

Code or under applicable state law. Neither the Debtors nor Purchaser have entered into the PSA

or are consummating the Sale with any fraudulent or otherwise improper purpose.

S.     Purchaser is not a mere continuation of the Debtors or their estates, and there is no

continuity of enterprise between Purchaser and the Debtor. Purchaser is not holding itself out to

the public as a continuation of the Debtor. Purchaser is not a successor to the Debtors or their

estates, and the transactions contemplated by the PSA do not amount to a consolidation, merger,

or de facto merger of Purchaser and the Debtor.

T.     The Sale outside a plan of reorganization pursuant to the PSA is reasonable and

appropriate under the circumstances and does not impermissibly dictate the terms of any future

plan of reorganization or liquidation that may be filed by the Debtor, individually or collectively,

and is not a *sub rosa* plan.

U.     The Debtors have demonstrated both (a) good, sufficient, and sound business

purpose and justification for the sale of the Assets and (b) compelling circumstances for approval

of Sale pursuant to Bankruptcy Code § 363(b) and (f).

V.     The Sale is legal, valid, and properly authorized under all applicable provisions of

the Bankruptcy Code, including, without limitation, Sections 105(a), 363(b), 363(f), and 363(m)

of the Bankruptcy Code, and all of the applicable requirements of such sections have been

complied with in respect of the Sale. In particular, the Debtors may sell the Assets free and clear

of all Interests of any kind or nature whatsoever because, in each case, one or more of the standards

set forth in Sections 363(f)(l)-(5) of the Bankruptcy Code have been satisfied. Any party with an

interest in the Assets who did not object, or who withdrew its objection, to the Sale or the Sale

Motion is deemed to have consented pursuant to Section 363(f)(2) of the Bankruptcy Code. Any party with an Interest in the Assets who did object falls within one or more of the other subsections of Section 363(f) of the Bankruptcy Code and is adequately protected. More specifically, as provided herein, any liens against the Assets shall, upon consummation of the Sale, attach to the proceeds of the Sale in the same validity, perfection, and priority as such liens attached to the Assets as of the Petition Date. The Sale, including the transfer of the Assets to Purchaser pursuant to the PSA, will be a legal, valid, and effective transfer of the Assets and will vest Purchaser with all of the Debtors' rights, title, and interest in and to the Assets free and clear of all Interests which have, or could have, been asserted by the Debtors or its creditors.

W.     The Purchaser has identified in the PSA certain executory contracts it intends to assume. The Debtors gave notice to all counter-parties whose executory contracts the Purchaser seeks to assume of the amounts the Debtors believed to be necessary to assume such executory contracts, and no counter-parties objected to the amounts proposed in the Sale Notice. Accordingly, the Court finds that the proposed cure amounts in the Sale Notice are adequate to assume the executory contracts identified in the PSA.

X.     The PSA provides that the Debtor shall be responsible for and shall pay a real estate commission of six percent (6%) of the gross purchase price (the "**Broker Commission**") to Augenbaum Realty Corp. c/o Bernie Setton (the "**Broker**"). The Court finds that the Broker Commission is fair and reasonable under the circumstances and should be approved pursuant to 11 U.S.C. §§ 327 and 328.

Y.     This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding the provisions of Bankruptcy Rules 6004(h), the stay pursuant to Bankruptcy Rules 6004(h) is hereby waived, and this Order shall be effective and enforceable immediately

upon entry. To the extent necessary under Bankruptcy Rule 9014 and Rule 54(d) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that cause exists not to delay implementation of this Order.

**BASED UPON THE FOREGOING FINDINGS AND THE FINDINGS MADE ON THE RECORD AT THE SALE HEARING, GOOD CAUSE EXISTS FOR ENTRY OF THE FOLLOWING ORDER. IT IS THEREFORE ORDERED:**

1.      The Sale Motion is **GRANTED** as set forth herein.

2.      All objections to the Sale Motion and Sale that have not been withdrawn, waived, or settled are hereby **OVERRULED** on the merits, with prejudice, subject to the conditions and protections to certain creditors as expressly provided herein.

3.      All findings of fact and conclusions of law of this Court stated on the record at the Sale Hearing are incorporated herein by reference and made a part hereof.

### Approval of the PSA

4.      The PSA, including all exhibits and schedules thereto, and all of the terms and conditions thereof are hereby approved.

5.      Pursuant to Bankruptcy Code §§ 105, 363 and 365, the Debtors are authorized and directed to consummate the Sale, pursuant to and in accordance with the terms and conditions of the PSA.

6.      Without the need for any additional Court order, the Debtors and their managers are authorized and empowered to perform under, consummate, and implement the PSA, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the PSA, and to take all further actions as may be reasonably requested by Purchaser, or otherwise required under the PSA.

7.

**Transfer of the Assets**

8.      Pursuant to the Bankruptcy Code §§ 105, 363(b), and 363(f), the transfers of the

Assets to Purchaser pursuant to the PSA shall (a) be valid, legal, binding, and effective transfers, (b)

vest Purchaser with all rights, title, and interests in and to the Assets effective as of the time of the

transfers under the PSA, and (c) be free and clear, unless otherwise specified in the PSA or this

Order, of all Interests, including, without limitation, all mortgages, restrictions, hypothecations,

charges, indentures, loan agreements, instruments, leases, licenses, options, deeds of trust, security

interests, conditional sale or other title retention agreements, pledges, liens—including, without

limitation, mechanics', materialmens', and other consensual and non-consensual liens and statutory

liens—judgments, demands, encumbrances, rights of first refusal, offsets, contracts, rights or

recovery, claims for reimbursement, contribution, indemnity, exoneration, products liability, alter-

ego, environmental, or tax, decrees of any court or foreign or domestic governmental entity, or

charges of any kind or nature, if any but not limited to, any restriction on the use, voting, transfer,

receipt of income or other exercise of any attributes of ownership, debts arising in any way in

connection with any agreements, acts, or failures to act, of ownership, debts arising in any way in

connection with any agreements, acts, or failures to act, of either of the Debtors or their predecessors

or affiliates, claims (as that term is defined in the Bankruptcy Code), reclamation claims, obligations,

liabilities, demands, guaranties, options, rights, contractual or other commitments, restrictions,

interests and matters of any kind and nature, whether known or unknown, choate or inchoate, filed

or unfiled, schedules or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or

unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated,

matured or unmatured, material or non-materials, disputed or undisputed, whether arising prior to

or subsequent to the commencement of these Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity or otherwise, including claims otherwise arising under doctrines of successor liability, whether arising prior to or subsequent to the commencement of these Chapter 11 Cases, and whether imposed by agreement, law, equity or otherwise, with all the same released, terminated and discharged as to the Assets.

9.      Any liens that attached to the Assets as of the Petition Date shall attach to the proceeds of the Sale in the same validity, perfection, and priority as such liens attached to the Assets as of the Petition Date.

10.     Notwithstanding anything to the contrary, nothing in this Sale Order shall be interpreted as authorizing the Debtors to sell any Assets that they do not own.

11.     All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtors to sell and transfer the Assets to Purchaser in accordance with this Sale Order and the terms of the PSA, or otherwise interfere with Purchaser's title to or use of enjoyment of the Assets.

12.     Pursuant to the PSA and this Order, the transfer and assignment of the Assets shall be effectuated on the terms set forth therein and herein, and shall not be restricted or prohibited, notwithstanding any alleged approval rights, consent rights, preferential purchase rights, rights or purchase, rights of first refusal, rights of first offer, or similar right with respect to the Debtors' transfer, sale, vesting, assumption, and/or assignment of the Assets.

13.     This Order shall be the Court's determination that, on the Closing Date, all Interests in and to the Assets being transferred and conveyed to Purchaser as described in the PSA shall be deemed to have been unconditionally released, discharged, and terminated from the Assets, and attach to the Proceeds as set forth herein.

14.     On and after the Closing, except as otherwise set forth herein or in the PSA, the Debtors shall have no liability or responsibility for any Assets.

**<u>Assignment Provisions</u>**

15.     Each of the executory contracts identified in Exhibit B to the Sale Motion (the "**<u>Assigned Contracts</u>**") are deemed assumed by the Debtors and assigned to the Purchaser pursuant to 11 U.S.C. 365, and any executory contracts or unexpired leases not identified in the PSA to be assumed are expressly rejected (the "**<u>Rejected Contracts</u>**"), as of the date of this Order. Notwithstanding anything contained in the PSA, Purchaser is not assuming any liabilities or obligations of the Debtors or their estates arising from the Rejected Contracts.  Further, the Debtors and counterparties to the Assigned Contracts are authorized to and shall cooperate to take such additional steps as may be reasonably necessary to further document or effectuate any assignments of the executory contracts identified in the PSA.

16.     Purchaser has provided adequate assurance of its future performance under each Assigned Contract and the proposed assumption and assignment of the Assigned Contracts satisfies the requirements of the Bankruptcy Code including, inter alia, Bankruptcy Code §§ 365(b)(1) and (3) and 365(f) to the extent applicable.

17.     Pursuant to Bankruptcy Code §§ 363(b), (f) and (m) and 365(a), (b) and (f), the assumption, assignment and sale to Purchaser of the Assigned Contracts by the Debtors shall be effected by this Order, effective as of Closing.

18.     The Closing shall occur within seven (7) days of the entry of this Order.

**<u>Approval of Broker Commission</u>**

19.     Pursuant to Bankruptcy Code §§ 327 and 328, the Broker Commission of six percent (6%) of the gross purchase price is approved, and the Debtors are authorized at Closing to

pay from the proceeds of the Sale, the Broker Commission to Augenbaum Realty Corp. c/o Bernie Setton.

### **Additional Provisions**

20.      On the Closing Date, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release its interest in the Assets, if any, as such interests may have been recorded or may otherwise exist.

21.      Regardless of whether the Debtors' creditors execute the releases set forth in the above paragraphs, this Order (a) shall be effective as a determination that, on the Closing Date, all Interests of any kind or nature whatsoever existing with respect to the Assets have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected and (b) shall be binding upon and shall govern the acts of all entities, including without limitation all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local official, and all other persons and entities who may be required by operation of law, the duties of their offices, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Assets.

22.      Each and every federal, state, and local governmental agency or department is hereby directed to accept for filing and/or recording, and approve as necessary, any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the PSA.

23.      To the extent permitted by § 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relation to the operation of the Assets sold, transferred, or

conveyed to Purchaser on account of the filing or pendency of this Bankruptcy Case or the Closing of the Sale.

24.    If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing any Interests with respect to the Debtors or the Assets shall not have delivered to the Debtors prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Interests which the person or entity has with respect to the Debtors or the Assets or otherwise, then (a) the Debtors are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Assets and (b) Purchaser is hereby authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Interests in the Assets of any kind or nature whatsoever.

25.    All entities that presently are in possession of some or all of the Assets hereby are directed to surrender possession of the Assets to Purchaser at the Closing Date.

26.    This Court retains exclusive jurisdiction so long as the Debtors' Bankruptcy Cases are pending to (i) enforce and implement the terms and provisions of the PSA, all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith in all respects and (ii) determine as a core proceeding (by motion and without necessity for an adversary proceeding if the Court deems appropriate) any proceeding, dispute, or controversy arising out of or related to this Order and the Sale Hearing.

27.    The transactions contemplated by the PSA are undertaken by Purchaser in good faith, as that term is used in Bankruptcy Code § 363(m). Accordingly, the reversal or modification of the authorization provided herein to consummate the transactions contemplated herein shall not affect

the validity of the Sale, unless such authorization is duly stayed. Purchaser is a purchaser in good faith of the Assets and, upon the occurrence of the Closing Date, is entitled to all of the protections afforded by Bankruptcy Code § 363(m).

28.     The consideration to be provided by Purchaser for the Assets under the PSA (a) shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code, Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, and all other applicable laws of the United States, any state, territory, possession or the District of Columbia, and (b) is fair and reasonable, and the Sale may not be avoided under § 363(n) of the Bankruptcy Code.

29.     Purchaser is not a successor to the Debtors or their estates by reason of any theory or law or equity and, except as set forth in the PSA, Purchaser shall have no liability or responsibility for any liabilities or other obligations of the Debtors arising under or related to the Assets.

30.     Article 6 of the Uniform Commercial Code governing Bulk Sale Transfers and comparable state statutes are not applicable to the Sale.

31.     Nothing contained in any chapter 11 plan confirmed in these Bankruptcy Cases (or any order of this Court confirming such plan) shall conflict with or derogate from the provisions of the PSA or terms of this Order, provided that the retention of jurisdiction under this Order following confirmation of such plan shall not be broader than jurisdiction permitted to be retained under an order of confirmation.

32.     The terms and conditions of the PSA and this Order shall be binding in all respects and shall inure to the benefit of the Debtors, their respective bankruptcy estates and their creditors and interest holders, successors, and assigns and Purchaser, and its respective affiliates, successors and assigns notwithstanding any subsequent appointment of any trustee(s) under any chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding.

33.     The PSA and the transactions and instruments contemplated hereby shall not be subject to rejection or avoidance by the Debtors, and their respective affiliates, successors, and assigns, or any chapter 7 or chapter 11 trustee of the Debtors and their estates.

34.     The PSA and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof, without further order of the Court, provided that such modification, amendment, or supplement shall not have a material adverse effect on the Debtors' bankruptcy estates.

35.     Notwithstanding anything in this Order or the PSA, the secured taxes for the 2022 and 2023 tax years of Dallas County and Richardson Independent School District shall be paid in full at Closing, together with applicable statutory interest. A portion of the 2024 taxes, prorated for the period from January 1, 2024 through the date of Closing, shall be credited to the Purchaser at Closing. The Purchaser shall assume full responsibility for the 2024 taxes due to Dallas County and Richardson Independent School District and shall pay the 2024 taxes to Dallas County and Richardson Independent School District in full when due. If not timely paid, Dallas County and Richardson Independent School District may proceed with non-bankruptcy collections against the Purchaser and the property, without leave or approval of the Court. The pre-petition and post-petition liens of Dallas County and Richardson Independent School District shall remain attached to the taxable property until the tax claims are paid in full. Any dispute as to proration between the Debtor and the Purchaser does not alter the Purchaser's liability to pay the 2024 taxes. All parties' rights to object to the priority, validity, amount, and extent of the claims of Dallas County and Richardson Independent School District are preserved.

36.     Notwithstanding anything in this Order or the PSA, the amounts asserted in the secured claim of Pegasus Bank, filed as Claim No. 9 in Case No. 24-30017 and Claim No. 2 in Case No. 24-30018 (collectively, the "**Pegasus Bank Proof of Claim**"), shall be paid in full at Closing. Pegasus Bank shall file, within three (3) days of the entry of this Order, an application pursuant to section 11 U.S.C. § 506(b) (the "**Pegasus 506(b) Application**") asserting any post-petition interest, post-petition fees, post-petition costs, and post-petition legal fees and costs it alleges it may be owed as a result of being a secured creditor, and if the Debtors do not pay at Closing as allowed herein, the Debtors shall escrow and reserve an amount equal to 125% of the amount of post-petition interest asserted in such Pegasus 506(b) Application and 100% of such other costs asserted, including reasonable attorneys' fees, specified in the such Pegasus 506(b) Application until entry of an order of the Court resolving such Application; provided, however, if the Debtors agree with the amount specified in the Pegasus 506(b) Application, the Debtors may pay such amounts agreed to at Closing. All parties' rights to object to the priority, validity, amount, and extent of the claims of Pegasus Bank are preserved. For the avoidance of doubt, the Assets shall be transferred free and clear of all pre-petition and post-petition liens asserted by Pegasus Bank.

37.     Notwithstanding anything in this Order or the PSA, the Debtor shall escrow from the proceeds of the Sale the amount necessary to pay any outstanding hotel occupancy taxes owed to the City of Dallas for the 2020, 2021, 2022, and 2023 tax years and any amounts owed for 2024 hotel occupancy taxes incurred through the date of Closing, together with applicable statutory penalties and interest. For the avoidance of doubt, the Assets shall be transferred free and clear of all pre-petition and post-petition liens asserted by the City of Dallas; provided, however, to the extent the City of Dallas has a valid, properly perfected lien on the Assets, any such lien shall attach to the proceeds of the Sale in the same validity, perfection, and priority that existed as of the Petition Date.

Further, all parties' rights to object to the validity, perfection, priority, and amount of the City of Dallas's claim are preserved, including but not limited to Purchaser's right to contest any claims or liens of City of Dallas as against Purchaser and/or the Assets; provided, however, that any party that seeks to object to the validity, perfection, priority, and amount of the City of Dallas's claim shall file its objection to such claim within thirty (30) days of the entry of this Order.

38.     The transaction contemplated by this Sale Order does not and shall not include or otherwise provide for a transfer, sale, or assumption/assignment of the Membership Agreement between the Debtor and TMH Worldwide, LLC ("**TMH**"). Neither this Sale Order nor the PSA shall operate to transfer or confer upon Purchaser any rights to the Membership Agreement or to otherwise use the protected intellectual property of TMH including trademarks, service marks, and logos. Any continued operation of the Property as a TMH hotel is conditioned upon a separate written agreement between the Purchaser and TMH. This Sale Order does not and shall not permit a sale free and clear of TMH's rights against the Purchaser or any designee of the Purchaser ("**Purchaser Designees**") of the Property to the extent such Purchaser or Purchaser Designees use trademarks or other intellectual property of TMH in connection with the Property after the Closing of the Sale for the Property unless such Purchaser or Purchaser Designees have entered into a new membership agreement with TMH. If the Closing Date occurs, the Membership Agreement shall, as of 12:01 a.m. on the Closing Date, be rejected by the Debtor pursuant to section 365(a) of the Bankruptcy Code and deemed terminated by TMH, and such rejection and termination will occur automatically without the requirement of any further action on the part of the Debtor or TMH to effect such rejection and termination. With respect to the Membership Agreement, nothing in the Sale Motion, the PSA or any other Transaction Document, this Sale Order, or any of the exhibits thereto, shall waive, impair, or restrict TMH's rights (a) file an amended proof of claim for rejection damages; (b)

to seek enforcement of the Debtor's post-termination non-monetary obligations to TMH under the Membership Agreement, including but not limited to, any de-identification provisions of the existing Membership Agreement post-rejection to the extent that (1) the de-identification provisions have not been completed pursuant to the terms of the existing Membership Agreement and (2) Purchaser or the Purchaser Designee have not entered into a new membership agreement with TMH; and/or (ii) seek damages against the Debtor and/or Purchaser for improper use of TMH's intellectual property after the Closing, with all rights of the Debtors, the Purchaser, and any other person to object to any of the aforementioned claims being fully preserved.

39.     The insurance policies financed pursuant to the terms of that certain Premium Finance Agreement dated August 23, 2023, entered into by 1NOnly Phimar, LLC and Pathward NA, and all associated unearned premiums are excluded from the term Assets under the PSA and are not included in the Assets to be transferred under the PSA.

40.     The provisions of this Order are non-severable and mutually dependent. Headings are included in this Order for each of reference only.

41.     In the event of any inconsistency between the terms of this Order and the PSA, the terms and provisions of this Order shall control.

42.     Notwithstanding the provisions of Bankruptcy Rules 6004(h), there is no stay pursuant to Bankruptcy Rule 6004(h) and this Order shall be effective and enforceable immediately upon entry.

### ### END OF ORDER ###

**Prepared by:**

*/s/ Megan F. Clontz*
Jason P. Kathman
Texas Bar No. 24070036
Megan F. Clontz
Texas Bar No. 24069703
SPENCER FANE LLP
5700 Granite Parkway, Suite 650
Plano, TX 75024
(972) 324-0300 – Telephone
(972) 324-0301 – Facsimile
Email: jkathman@spencerfane.com
Email: mclontz@spencerfane.com

**COUNSEL FOR DEBTORS
AND DEBTORS-IN-POSSESSION**

# EXHIBIT 1

# EXHIBIT 1

## PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement (the "PSA" or "Contract") is made between 1Nonly Phimar LLC, a Texas limited liability company, and Phimars Square LLC, a Texas limited liability company (collectively, "Seller") and AIDS Healthcare Foundation, Inc., a California public benefit corporation ("Purchaser").

## RECITALS

A.    On or about January 1, 2024, the Seller commenced voluntary cases for bankruptcy under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court"). The bankruptcy cases are jointly administered under the case styled *In re 1Nonly Phimar LLC et al*, Case No. 24-30017-sgj11 (the "Bankruptcy Cases");

B.    Purchaser desires to purchase certain assets and real estate of Seller;

C.    Seller desires to sell certain assets and real estate to Purchaser.

D.    Seller and Purchaser intend to effectuate the transaction contemplated herein through a sale approved pursuant to various sections of the United States Bankruptcy Code, including, but not limited to, sections 105, 363, and 365.

NOW, THEREFORE, in consideration of the agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser agree as follows:

## ARTICLE I
## Sale and Purchase

1.1    <u>Assets Subject to Sale</u>. Subject to the terms and provisions of this Contract, Seller hereby agrees to sell and convey to Purchaser, and Purchaser hereby agrees to buy and pay for all of the following described property (sometimes referred to herein in the aggregate as the "Property" or the "Assets"):

(a)    those certain tracts of land located in Dallas County, Texas, generally described as 8051 Lyndon B. Johnson Fwy, Dallas, Texas and 8101 Lyndon B. Johnson Fwy, Dallas, Texas, together with all of Seller's right, title and interest in and to the rights and appurtenances pertaining to such tracts of land, including any right, title and interest of Seller in and to adjacent strips and gores between such tracts of land and any abutting properties, adjacent roads, streets, alleys, easements or rights-of-way (the legal description for which will be updated pursuant to the Title Commitment issued by the Title Company) (collectively, the "Real Property");

(b)    the buildings, structures, fixtures and other improvements on the Real Property, including, without limitation, that certain 160 unit hotel located and commonly

known as the Iban Hotel (collectively, the "Improvements");

(c)    all equipment, fixtures, machinery, building materials and other personal property owned by Seller and used in connection with the operation, management, and maintenance of the Real Property and the Improvements, including, without limitation, all furniture, bedding sheets, covers, pillows, appliances, camera systems, key card systems, keys, licenses, permits (to the extent assignable), books, records, plans and specifications, architectural and engineering drawings, contract rights, consents, and other intangible property pertaining to the Real Property and Improvements (collectively, the "Personal Property"); and

(d)    all of Seller's right, title and interest in and to (i) all assignable contracts and agreements (collectively, the "Operating Agreements"), relating to the upkeep, repair, maintenance or operation of the real property, improvements or personal property which shall extend beyond the Closing Date, including specifically, without limitation, all assignable equipment leases and (ii) all assignable existing warrantees and guarantees (express or implied) issued to Seller in connection with the improvements or the personal property (collectively, the "Intangibles").

1.2    <u>Excluded Assets</u>.  Assets of Seller not to be transferred to Purchaser include:

(a)    Two shuttle vans leased by Seller from Highgarden, LLC;

(b)    Accounts Receivable of Seller;

(c)    Cash and cash equivalents of Seller;

(d)    Liquor license held by 1 World Bev LLC, an affiliate of Seller (it shall be Purchaser's sole responsibility and obligation to obtain a liquor license for the Property, if so desired by Purchaser);

(e)    Any contracts or agreements between the Debtor and any other party specifically relating to operation of the Real Property and Improvements as a Wyndham or Trademark Collection hotel, including but not limited to any management, franchise, and flagship agreements, brand-specific software licenses, and leases of personal property from or by Wyndham and its affiliate entities; and

(f)    Other assets of Seller not included within the definition of the Property as described above.

## ARTICLE II
### Earnest Money Deposit

2.1    <u>Amount and Title Company</u>.   Prior to execution of this Contract, Purchaser deposited the sum of One Million and No/100 Dollars ($1,000,000.00) (the "Earnest Money") with Chicago Title, Attn: Derek Long, 5950 Sherry Lane, Suite 220, Dallas, Texas 75225; Derek@ChicagoTitleCo.com; 214-521-2424 (the "Title Company").

2.2    <u>Deposit and Application</u>.   Any interest accruing on any account the Earnest Money was deposited into prior to entry into this Contract becomes the property of Seller or Seller gains the rights thereto, shall be reported for tax purposes under the tax identification number of Purchaser.   After such time as Seller becomes entitled to the Earnest Money, the interest accruing or paid may be reported under Seller's tax identification number.   All interest accruing on the Earnest Money shall be added to the account and shall constitute a part of the Earnest Money for the purposes of this Contract.   In the event that this Contract is actually closed and consummated in accordance with the terms hereof, the Earnest Money shall be applied toward the cash payment due at Closing (as hereinafter defined) by Purchaser to Seller in accordance with the terms of Article III hereinbelow.   In the event that this Contract does not actually close and consummate in accordance with the terms hereof, the Earnest Money shall be disbursed by the Title Company to Seller or Purchaser (as appropriate) in accordance with the terms of this Contract.   In the event that Purchaser shall fail to timely deposit the Earnest Money (or, if in the form of a check, the bank on whom such check is drawn refuses to fully honor such check when negotiated and presented for payment by the Title Company), this Contract shall, by written notice from Seller to Purchaser terminate, and any portion of the Earnest Money held by the Title Company shall be delivered to Seller.

2.3    <u>Independent Contract Consideration</u>.   To the extent that this Contract is ever construed as an option agreement, Seller and Purchaser hereby acknowledge that independent consideration for such option in the sum of $100.00 shall be delivered to Seller out of the Earnest Money should this Contract terminate for any reason whatsoever excepting the closing of this Contract, in which event the option consideration shall be applied to the Purchase Price; and based on such consideration and the mutual covenants of Seller and Purchaser contained herein, Seller hereby agrees that any such option granted Purchaser is irrevocable and Seller shall not terminate said option without the prior written consent of Purchaser except as may be expressly provided for herein.

## ARTICLE III
## Purchase Price

3.1     <u>Purchase Price</u>. The total purchase price for the Property (the "Purchase Price") shall be a sum of Ten Million Five Hundred Thousand and No/100 Dollars ($10,500,000.00), payable by Purchaser delivering to the Title Company at Closing, cash by current wire transfer of federal funds, cashier's check or other evidence of current funds acceptable to the Title Company for immediate disbursement by the Title Company to Seller at Closing.  Purchaser shall have the responsibility of providing same day immediately available funds so that disbursement of proceeds shall be made on the day of Closing.

## ARTICLE IV
## Bankruptcy Approval

4.1     <u>Bankruptcy Approval Required</u>. Purchaser and Seller acknowledge that Seller filed a voluntary petition for bankruptcy under chapter 11 of the United States Bankruptcy Code and that the sale contemplated herein is subject to approval by the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court"), where Seller's bankruptcy case is presently pending.

4.2     <u>Closing Date</u>. The consummation of the transaction evidenced by this Contract (the "Closing") shall take place at the offices of the Title Company, or at such other place or through such other means approved by the parties, within seven (7) days of entry of an order of the Bankruptcy Court approving the Sale Motion, which the parties contemplate will be no less than twenty-seven (27) days after the Earnest Money is transferred to the Escrow Agent (with the date of Closing being referred to as the "Closing Date").

## ARTICLE V
## Investigation by Purchaser

5.1     <u>Submission Matters Delivered to Purchaser</u>.  Pursuant to the Letter of Intent dated February 26, 2024 (the "LOI"), within three (3) business days after execution of the LOI, Seller shall deliver to Purchaser the following items, if in Seller's possession (collectively, the "Submission Matters") (provided that documents or instruments recorded with the County Clerk's Office and related to the Property will be provided with the Title Commitment):

(a)     All existing environmental report(s) and/or documentation (if any) relating to the Property;

(b)     Existing land survey(s) for the Property in PDF and CAD formats (if any);

(c)     Architectural, Structural, MPE, and any and all relating plans of the Property in PDF and CAD formats (if any);

(d)     Existing ALTA title commitment for the Property, together with legible copies of all documents which will remain of record (if any);

(e)     All CUP's and TCO's and C of O's (collectively "Occupancy and Use Permits") relating to the Property (if any);

(f)     Any existing service contracts relating to the Property;

(a)     Copies of all tax bills and other documents having an economic impact on the Property for the previous two (2) years, including, but not limited to, property, personal, rental, hotel occupancy, and special assessments relating to the Property;

(b)     Copies of all utility bills for Property for the previous twelve (12) months;

(c)     Franchise and Management documents relating to the Property;

(d)     Profit and loss statements for 2021, 2022, and YTD; and

(e)     An updated title commitment with legible copies of all exceptions.

All Submission Matters and any environmental, engineering, or other reports procured by Purchaser shall promptly be returned to Seller by Purchaser if this Contract is not consummated for any reason.  Seller makes no representation or warranty with respect to any of the third-party reports comprising the Submission Matters, including as to accuracy, completeness or scope or quality of the work.

5.2     Intentionally Omitted.

5.3     Intentionally Omitted.

5.4     Confidentiality of Submission Matters.  As a condition to Purchaser's receipt of the Submission Matters, Purchaser agrees to treat such information in accordance with the provisions of this Section 5.4 and to take or refrain from taking certain actions as hereinafter set forth. Purchaser agrees that the Submission Matters (a) shall be used solely for the purpose of evaluating the purchase of the Property, and (b) shall be kept confidential and shall not be disclosed to any person, firm or entity, except employees, consultants and representatives of Purchaser who need to know such information for the purpose of evaluating the potential purchase of the Property, and who have otherwise agreed to be bound by the terms of this Section 5.4.  In addition, disclosure of the Submission Matters may be made upon receipt of the prior written consent of Seller.  Purchaser acknowledges that, given the confidential nature of the Submission Matters, Seller may be irreparably damaged by any unauthorized disclosure as provided herein.  As a result thereof, Purchaser agrees that Seller may enforce this provision of the Contract by legal proceedings, including injunctive and other equitable relief.  The agreement of Purchaser set forth in this Section 5.4 of the Contract shall expressly survive any termination of the Contract by either Seller or Purchaser as provided herein.

## ARTICLE VI
## Warranties and Representations

6.1    <u>Seller's Warranties and Representations</u>.    Seller represents and warrants to Purchaser as of the date hereof and as of the Closing Date that:

(a) Seller has good and indefeasible fee-simple title to the Real Property and Improvements, and at the Closing, Seller shall have and shall convey to Purchaser good and indefeasible fee-simple title to the Real Property and Improvements, free and clear of all liens, defects, encumbrances, conditions, exceptions, restrictions or other matters affecting title, except the Permitted Exceptions. Seller has the right, title and authority to execute and perform this Contract and to consummate the transaction contemplated herein

(b)    Seller has not received any written notice of any pending condemnation or similar proceeding affecting the Real Property and Seller has not received any written notice and has no actual knowledge that any such proceeding is contemplated.

(c)    There are no attachments, executions, assignments for the benefit of creditors, receiverships, or conservatorships pending against Seller or to Seller's actual knowledge threatened against Seller or the Property.

(d)    Except for approval from the United States Bankruptcy Court, no consent, approval or other action of, or filing or registration with, any governmental agency, commission or officer is required in connection with the execution or performance by Seller of this Contract or any of the transactions provided for hereunder.

(e)    The execution and delivery of this Contract and the transactions provided herein shall not result in a breach of any terms and provisions of or constitute a default under or conflict with any agreement, indenture, mortgage, lien, lease, consent, license, franchise or other instruments to which Seller or any person or entity which Seller represents is bound.

For purposes of this <u>Section 6.1</u>, references to the "actual knowledge" or "knowledge" of Seller shall refer only to the actual knowledge of the Designated Representative (as hereinafter defined) of Seller, and shall not be construed, by imputation or otherwise, to refer to the knowledge of Seller, to any property manager, or to any other officer, agent, manager, representative or employee of Seller or to impose upon such Designated Representative any duty to investigate the matter to which such actual knowledge, or the absence thereof, pertains. As used herein, the term "Designated Representative" shall refer to Philip Levine. Seller represents and warrants to Purchaser that Philip Levine is the representative of Seller with the most knowledge of the operations conducted at the Property, and to whom notices concerning the matters described in <u>Section 6.1</u> would typically be sent.

6.2    <u>Purchaser's Representations and Warranties</u>.    Purchaser hereby represents and warrant as of the date hereof and as of the Closing Date that:

(a)    Purchaser has the right, title, and authority to enter into this Contract, to

comply with all the terms and obligations hereof and to consummate the transactions provided for hereunder.  This Contract shall, when executed and delivered by Purchaser, constitutes the valid and binding obligation of Purchaser enforceable in accordance with its terms.

(b)     No consent, approval, or other action of, or filing- or registration with, any governmental agency, commission or officer is required in connection with the execution or performance by Purchaser of this Contract or any of the transactions provided for hereunder.

(c)     There has not been filed by or, to Purchaser's knowledge, against Purchaser, a petition in bankruptcy or insolvency proceedings or for reorganization, or for the appointment of a receiver or trustee, nor has any such entity made an assignment for the benefit of creditors or filed a petition for an arrangement or entered into any arrangement with creditors or admitted in writing the inability to pay its debts as they become due.

(d)     The execution and delivery of this Contract and the transactions provided for herein shall not result in a breach of any of the terms and provisions of or constitute a default under or conflict with any agreement, indenture, mortgage, lien, lease, consent, license, franchise or other instruments to which Purchaser or any person or entity which Purchaser represents is bound.

6.3     <u>Survival of Representations and Warranties</u>.  The foregoing representations and warranties of Seller and Purchaser are made as of the date the parties execute this Contract and shall be remade by each party as of the date of Closing; provided that Seller may update the information in such representations and warranties as appropriate from matters occurring (but not caused by or consented to by Seller) between the date Seller executes this Contract and the Closing Date by written notice to Purchaser on or prior to the earlier of two (2) business days after Seller acquiring notice of such change and the Closing Date.  If Seller updates such representations and warranties pursuant to the preceding sentence and the update changes the information in such representations and warranties in a materially detrimental way between the date Seller executes this Contract and the Closing Date, Purchaser may, within five (5) business days' notice of such updates, as its sole remedy, terminate this Contract by written notice to Seller, in which event the Earnest Money shall be returned to Purchaser, and the parties shall have no further obligations under this Contract, except for the indemnities which expressly survive the termination of this Contract.  All representations and warranties contained in Article 6 hereof shall survive the closing of this transaction, but shall expire on the six (6) month anniversary of the Closing Date.  If within such time Purchaser does not commence legal action against Seller for any inaccuracy in such representations and warranties, such representations and warranties shall be of no further force or effect.

6.4     <u>Covenants of Seller</u>.  Seller hereby covenants with Purchaser that, from the date of this Contract until the Closing Date or earlier termination of this Contract:

(a)     Seller shall (i) continue to operate the Property in accordance with its present operating policy; and, (ii) maintain, in force and effect, property and liability insurance with

respect to damage or injury to person or property occurring on the Property in at least such amounts as are maintained by Seller as of the date of this Contract. It is the intention of the parties that the general operation of the Property shall not be materially changed between the date of this Contract and the Closing Date, except as herein provided or to the extent Seller, in the ordinary course of business, deems such change to be reasonably necessary or advisable.

(b)    Seller shall not enter into any new Operating Agreements relating to the Property (i) without prior written notification to Purchaser (which notification shall include a statement fully disclosing the obligations and costs associated therewith, and any other information reasonably requested by Purchaser) and (ii) without Purchaser's consent (not to be unreasonably withheld) if such Operating Agreements may not be terminated prior to Closing. Seller agrees that there shall be no contracts in existence at the Closing for the management of the Property, and Seller agrees to terminate any existing management contract on the Closing Date. Except as to Operating Agreements that either Purchaser notifies Seller in writing to continue prior to the expiration of the Inspection Period or as to Operating Agreements which were delivered to Purchaser pursuant to Section 5.1 and contain a fixed term expiring after the Closing Date (collectively, the "Assigned Contracts"), all Operating Agreements shall be terminated by Seller as of the Closing. The Assigned Contracts shall be assigned to and assumed by Purchaser at the Closing.

## ARTICLE VII
### Closing

7.1    Time and Place of Closing. The Closing shall take place at the offices of the Title Company, or at such other place or through such other means approved by the parties, within seven (7) days of entry of an order approving the Sale Motion, which the parties contemplate will be no less than twenty-even (27) days after the Earnest Money is transferred to the Escrow Agent (with the date of Closing being referred to as the "Closing Date").

7.2    Closing Costs. Seller shall pay, at its sole cost and expense, all closing costs, broker fees, and transfer taxes in connection with the delivery and recording of the instrument conveying the Property. Purchaser shall pay for an updated survey, title insurance policy, and all of its due diligence costs. All other costs shall be paid in accordance with local custom for similar transactions. All real and personal property taxes and rents shall be prorated as of the date of closing. Each party shall pay its own attorneys' fees; provided, however, in the event of any litigation arising hereunder, the prevailing party shall be entitled to recover, as part of any judgment rendered, reasonable attorneys' fees and cost of suit. Except as otherwise provided in this Section 7.2 or elsewhere in this Contract, all other expenses hereunder shall be paid by the party incurring such expenses.

7.3    Adjustments and Prorations.

(a)    The parties agree that the "Cut-off Time" shall mean 11:59 pm at the Property on the date prior to the Closing Date.

(b)     The following matters and items shall be apportioned between the parties based on actual daily amounts or, where appropriate, credited in total to a particular party, as of the Cut-off Time as provided below:

(i)     To the extent possible, trade accounts payable shall be identified as of the Cut-off Time and paid in full at the Closing by Seller.  Seller shall be and remain responsible for the full payment of any and all other trade accounts payable (whether known or unknown) as of the Cut-off Time.  Except to the extent a credit therefor is provided to Purchaser hereunder at Closing, Seller shall indemnify and hold Purchaser harmless from and against any claims arising from the failure to timely pay any trade accounts payable with respect to the period prior to the Cut-off Time.

(ii)    Real and personal property taxes, assessments, water and sewer rents, rates and charges, and other municipal permit fees and assessments (collectively, the "Property Taxes") shall be prorated as of the Cut-off Time.

(iii)   Gas, electricity, and other utility charges shall be apportioned at Closing on the basis of the most recent meter reading occurring prior to Closing (but subject to later readjustment as set forth below).

(iv)    Non-delinquent operational and/or occupancy taxes (unless amounts attributable to the period prior to the Closing Date are paid directly by Seller to the applicable taxing authority) shall be prorated as of the Cut-off Time.

(v)     Any amounts prepaid or payable under any Operating Agreements shall be prorated as of the Cut-off Time.  All security deposits shall be transferred to Purchaser and all obligations with respect to such security deposits shall be assumed by Purchaser and Seller shall receive a credit in the amount of such transferred security deposits.

(c)     Notwithstanding anything contained in the foregoing provisions:

(i)     The final Closing Statement shall provide for a credit to the account of Seller of all cash or other deposits posted with utility companies (including, without limitation, telephone, internet, heat, steam, electricity, gas, and lighting) serving the Property, to the extent the same are transferable and provided such deposits remain on deposit for the benefit of Purchaser.

(ii)    Any Property Taxes shall be prorated as of the Closing Date.  Property Taxes for 2024 shall be prorated based on an amount equal to 100% of the 2023 Property Taxes.  To the extent that the actual 2024 Property Taxes differ from the amount apportioned at Closing, the parties shall make all necessary adjustments by appropriate payments between themselves following Closing.  All necessary adjustments shall be made within fifteen (15) business days after the tax bill for the current year is received.  Except

to the extent that Purchaser has received a credit therefor, Seller shall remain responsible for all Property Taxes related to the Property that accrued for periods ending prior to the Cut-off Time (whenever assessed or billed). Purchaser shall be responsible for all Property Taxes accrued for periods beginning after the Cut-off Time. Seller shall indemnify and hold Purchaser harmless from and against any claims arising from the failure to timely pay and discharge such taxes and assessments related to the Property with respect to the period prior to the Cut-off Time. Purchaser shall indemnify and hold Seller harmless from and against any claims arising from the failure to timely pay and discharge such taxes and assessments related to the Property with respect to the period after to the Cut-off Time.

(iii)    Telephone contracts and contracts for the supply of heat, steam, electricity, gas, lighting, and any other utility charges shall be prorated as of the Cut-off Time, with Seller receiving a credit for each deposit as provided above, if any. Where possible, cut-off readings will be secured for all utilities on the Closing Date. As to gas, electricity and other utility charges, Seller may, on notice to Purchaser, elect to pay one or more of all of said items accrued to the date hereinabove fixed for apportionment directly to the person or entity entitled thereto, and to the extent Seller so elects, such item shall not be apportioned hereunder, and Seller's obligation to pay such item directly in such case shall survive the Closing.

(iv)    As of the date immediately prior to the Closing Date, Seller shall conduct an inventory of all Consumables on hand as of the Closing Date and deliver a written report thereon to Purchaser. At Closing, Purchaser shall purchase and pay separately (and not as part of the Purchase Price) for all Consumables at the Property at Seller's purchase price. As used herein, "Consumables" shall mean all unopened food and beverages (alcoholic, to the extent transferable under applicable law, and non-alcoholic); engineering, maintenance, and housekeeping supplies, including soap, cleaning materials and matches; stationery and printing; and other supplies of all kinds, in each case whether partially used, unused, or held in reserve storage for future use in connection with the maintenance of the Property, which are on hand on the date of this Contract subject to such depletion and restocking as shall occur and be made in the normal course of business but in accordance with present standards.

(v)    At Closing, Seller shall receive (or receive a credit in an amount equal to) all revenue (after the settlement of applicable commissions and/or costs) relating to vending machines in the Property up until the Cut-off Time, and Purchaser shall receive a credit in the amount of any advance payments made to Seller for vending machines to the extent attributable to any period after the Cut-off Time.

(vi)    Revenues from the Property's guest rooms and facilities occupied on the evening immediately preceding the Closing Date, including, without

limitation, any all parking charges and sales from mini-bars, in-room movies, laundry and other service charges allocable to such rooms, conferences, receptions, meetings, and other functions occurring in any conference, banquet, or meeting rooms in the Property or in any adjacent facilities owned or operated by Seller shall be credited to Seller.

(vii)   Food and beverage sales, usage charges and related taxes, valet parking charges, equipment rentals, and telecommunications charges, shall be prorated as of the Cut-off Time.

(viii)  The parties acknowledge that certain taxes and assessments accrue and are payable to the various local governments by any business entity operating a hotel and its related facilities.  Included in those taxes and assessments may be business and occupation taxes, retail sales taxes, parking taxes, gross receipts taxes, and other special lodging or hotel taxes and assessments.  For purposes of this Contract, all of such taxes and assessments (expressly excluding taxes and assessments covered elsewhere in this Contract or corporate franchise taxes, and federal, state and local income taxes) shall be allocated between Seller and Purchaser such that those attributable to the period prior to the Cut-off Time shall be allocable to Seller and those attributable to the period after the Cut-off Time shall be allocable to Purchaser (with the attribution of such taxes and assessments hereunder to be done in a manner consistent with the attribution under this Contract of the applicable revenues on which such taxes and assessments may be based).  Seller shall be solely responsible for payment of such taxes and assessments with respect to the period prior to the Cut-off Time, and Purchaser shall be solely responsible for payment of such taxes and assessments with respect to the period after the Cut-off Time.  Seller agrees to promptly file all necessary tax returns and forms with respect to such taxes and assessments to the extent required by applicable law.  Seller shall indemnify and hold Purchaser harmless from and against any claims arising from the failure to timely pay and discharge such taxes and assessments with respect to the period prior to the Cut-off Time that relate to the Property.  Purchaser shall indemnify and hold Seller harmless from and against any claims arising from the failure to timely pay and discharge such taxes and assessments with respect to the period after to the Cut-off Time that relate to the Property.

(d)     Such other items as are provided for in this Contract or as are normally prorated and adjusted in the sale of a hotel shall be prorated as of the Cut-off Time.

(e)     Any net credit due to a Seller as a result of the adjustments and prorations under this Section 7.3 shall be paid to Seller in cash at the time of Closing.  Any net credit due to a Purchaser as a result of the adjustments and prorations under this Section 7.3 shall be credited against the Purchase Price at the time of Closing.

(f)     At the Closing, Seller shall remove all Cash-On-Hand at the Property, provided, however, that to the extent any Cash-On-Hand remains on the Property or is unable to be removed from the Property, the Seller shall transfer any remaining Cash-On-Hand to the Purchase, and Seller shall receive a credit at the Closing for such Cash-On-Hand. "Cash On-Hand" shall mean any and all till money and house banks, and any and all money in vending machines, postage meters, pay phones, laundry machines and other cash-operated equipment and all checks, travelers' checks, and bank drafts paid by guests of the Property and located at the Property, specifically excluding, however, all Account Cash. "Account Cash" shall mean the balances of all cash and securities and other instruments held by Seller for the benefit of Seller or the Property (including but not limited to any sums held in reserve by Seller's lenders) and deposited, held, or contained in any account, bank, or vault, except for Cash-On-Hand.

(g)     All Account Cash is and shall remain the property of Seller and shall either be retained by Seller at the Closing, or credited to Seller (to the extent actually acquired by Purchaser) on the final Closing Statement.

7.4     <u>Deliveries at Closing</u>.  At the Closing:

(a)     Seller shall deliver to Purchaser the following:

(i)      A Special Warranty Deed (the "Deed") duly executed and acknowledged by Seller, conveying to Purchaser good and indefeasible fee-simple absolute title to the Real Property, free and clear of any lien, encumbrance, or exception other than the Permitted Exceptions.

(ii)     A Blanket Conveyance, Bill of Sale and Assumption Agreement, duly executed by Seller, conveying to Purchaser the Personal Property, free and clear of any lien, encumbrance, or exception.

(iii)    A non-foreign certificate executed by Seller as required by Section 1445 of the Internal Revenue Code, as amended.

(iv)    Possession of the Property, subject only to the Permitted Exceptions, fully vacant of any guests and free and clear of any management/franchise/flagship agreements and any lease obligations.

(v)     All furniture, fixtures, bedding sheets, covers, pillows, appliances, camera systems, key card systems, keys, and tangible personal property used in the Seller's current operations, except for the excluded assets identified herein.

(vi)    To the extent in Seller's possession, the original copies of the Operating Agreements, if any.

(vii)   All keys, licenses, permits, books, records, plans, specifications and other items related to the Property.

(ix)   Such other instruments and documents as are reasonably appropriate, necessary and required by the Title Company or Purchaser to complete and evidence the transactions contemplated hereby.

(x)   Such evidence of the authority and capacity of Seller and its representatives, as Purchaser or the Title Company may reasonably require.

(b)   Purchaser shall deliver to Seller the following:

(i)   The cash payment due in accordance with Article III hereof.

(ii)   The Blanket Conveyance, Bill of Sale and Assumption Agreement, duly executed by Purchaser.

(iii)   Such other instruments and documents as are reasonably appropriate, necessary and required by the Title Company or Seller to complete and evidence the transactions contemplated hereby.

## ARTICLE VIII
## Disclaimer; Release and Waiver of Claims; Indemnification

8.1   <u>DISCLAIMER OF WARRANTIES</u>. EXCEPT AS SET FORTH IN SECTION 6.1 HEREOF, SELLER HEREBY SPECIFICALLY DISCLAIMS ANY WARRANTY, GUARANTY OR REPRESENTATION, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, OR CONCERNING (A) THE NATURE AND CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL AND GEOLOGY, THE SUITABILITY THEREOF AND OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH PURCHASER MAY ELECT TO CONDUCT, THE EXISTENCE OF ANY ENVIRONMENTAL HAZARDS OR CONDITIONS (INCLUDING BUT NOT LIMITED TO THE PRESENCE OF ASBESTOS OR OTHER HAZARDOUS MATERIALS) OR COMPLIANCE WITH APPLICABLE ENVIRONMENTAL LAWS, RULES OR REGULATIONS; (B) THE NATURE AND EXTENT OF ANY RIGHT-OF-WAY, LEASE, POSSESSION, LIEN, ENCUMBRANCE, LICENSE, RESERVATION, CONDITION OR OTHERWISE; (C) THE COMPLIANCE OF THE PROPERTY OR ITS OPERATION WITH ANY LAWS, ORDINANCES OR REGULATIONS OF ANY GOVERNMENTAL ENTITY OR BODY; AND (D) THE FUTURE REVENUES OR EARNINGS WHICH MAY BE DERIVED FROM PURCHASER'S OPERATION OR USE OF THE PROPERTY.   PURCHASER ACKNOWLEDGES THAT IT WILL INSPECT THE PROPERTY AND PURCHASER WILL RELY SOLELY ON ITS OWN INVESTIGATION OF THE PROPERTY AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY OR ON BEHALF OF SELLER. PURCHASER FURTHER ACKNOWLEDGES THAT THE INFORMATION PROVIDED AND TO BE PROVIDED WITH RESPECT TO THE PROPERTY WAS OBTAINED FROM A VARIETY OF SOURCES AND SELLER (1) HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION; AND (2) DOES NOT MAKE ANY REPRESENTATIONS AS TO THE ACCURACY OR COMPLETENESS OF

SUCH INFORMATION.  THE SALE OF THE PROPERTY IS MADE ON AN "AS-IS" BASIS, "WHERE-IS", "WITH ALL FAULTS" BASIS INCLUDING WITHOUT LIMITATION ANY CONDITIONS RELATING TO THE ENVIRONMENT, SAFETY OR PUBLIC HEALTH, AND PURCHASER EXPRESSLY ACKNOWLEDGES THAT, EXCEPT AS SET FORTH IN SECTION 6.1 HEREOF, SELLER MAKES NO WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF CONDITION, TITLE (OTHER THAN THE SPECIAL WARRANTY OF TITLE WITH RESPECT TO THE LAND AND THE IMPROVEMENTS), HABITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO THE PROPERTY OR ANY PORTION THEREOF.

8.2    <u>RELEASE AND WAIVER OF CLAIMS</u>.  EXCEPT AS IT MAY CONSTITUTE A BREACH OF A REPRESENTATION OR WARRANTY UNDER SECTION 6.1 HEREOF, PURCHASER AGREES THAT SELLER SHALL NOT BE RESPONSIBLE OR LIABLE TO PURCHASER FOR ANY CONSTRUCTION DEFECT, ERRORS, OMISSIONS, OR ON ACCOUNT OF ANY OTHER CONDITIONS AFFECTING THE PROPERTY, AS PURCHASER IS PURCHASING THE PROPERTY AS-IS, WHERE-IS, AND WITH ALL FAULTS.  AS SET FORTH IN THE PRECEDING SENTENCE, PURCHASER OR ANYONE CLAIMING BY THROUGH OR UNDER PURCHASER, HEREBY FULLY RELEASES SELLER, ITS EMPLOYEES, OFFICERS, DIRECTORS, REPRESENTATIVES, ATTORNEYS AND AGENTS FROM ANY AND ALL CLAIMS THAT IT MAY NOW HAVE OR HEREAFTER ACQUIRE AGAINST SELLER AND ITS RESPECTIVE EMPLOYEES, OFFICERS, DIRECTORS, REPRESENTATIVES, ATTORNEYS AND AGENTS FOR ANY COST, LOSS, LIABILITY, DAMAGE, EXPENSE, DEMAND, ACTION OR CAUSE OF ACTION ARISING FROM OR RELATED TO ANY CONSTRUCTION DEFECTS, ERRORS, OMISSIONS, OR OTHER CONDITIONS AFFECTING THE PROPERTY.  PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT THIS RELEASE SHALL BE GIVEN FULL FORCE AND EFFECT ACCORDING TO EACH OF ITS EXPRESSED TERMS AND PROVISIONS, INCLUDING, BUT NOT LIMITED TO, THOSE RELATING TO UNKNOWN AND UNSUSPECTED CLAIMS, DAMAGES AND CAUSES OF ACTION.  THIS COVENANT RELEASING SELLER SHALL SURVIVE CLOSING AND SHALL BE BINDING UPON PURCHASER.   THIS WAIVER AND RELEASE OF CLAIMS SHALL SURVIVE THE CLOSING.

## ARTICLE IX
### Termination, Default and Remedies

9.1    <u>Permitted Termination</u>.  If this Contract is terminated by either Seller or Purchaser pursuant to a right expressly given it to do so hereunder (herein referred to as a "Permitted Termination"), except for a termination by Seller because of the default of Purchaser, the Earnest Money, together with any accrued interest thereon, shall immediately be returned to Purchaser and this Contract shall thereafter be null and void.

9.2    <u>Default by Seller</u>.  Seller shall be in default hereunder upon the occurrence of any one or more of the following events:

(a)     any of Seller's warranties or representations set forth herein are untrue or inaccurate in any material respect when made or at Closing;

(b)     Seller shall fail to meet, comply with or perform any covenant, agreement, or obligation within the time limits and in the manner required in this Contract, for any reason other than a Permitted Termination; or

(c)     Seller shall fail to deliver at the Closing any of the items required of Seller in Section 7.4(a) hereof, for any reason other than a Permitted Termination.

In the event of a default by Seller under this Contract, Purchaser shall have the option of (i) terminating this Contract and receiving a refund of the Earnest Money or (ii) seeking specific performance. If the Purchaser chooses to terminate this Contract under this section, notice of such termination shall be provided by written notice delivered to Seller at or prior to Closing, which termination shall be a Permitted Termination as provided in Section 9.1 above.

9.3     Default by Purchaser. Purchaser shall be in default hereunder upon the occurrence of any one or more of the following events:

(a)     any of Purchaser's warranties or representations set forth herein are untrue or inaccurate in any material respect when made or at Closing;

(b)     Purchaser shall fail to meet, comply with or perform any covenant, agreement, or obligation on its part required within the time limits and in the manner required in this Contract, for any reason other than a Permitted Termination; or

(c)     Purchaser shall fail to deliver at the Closing any of the items required of Purchaser in Section 7.4(b) hereof, for any reason other than a Permitted Termination.

IN THE EVENT OF A DEFAULT BY PURCHASER HEREUNDER, SELLER, AS SELLER'S SOLE AND EXCLUSIVE REMEDY FOR SUCH DEFAULT, SHALL BE ENTITLED TO TERMINATE THIS CONTRACT BY NOTICE TO PURCHASER AND RETAIN PURCHASER'S EARNEST MONEY, INCLUDING ANY INTEREST ACCRUED THEREON, IT BEING AGREED BETWEEN PURCHASER AND SELLER THAT SUCH SUM SHALL BE LIQUIDATED DAMAGES FOR A DEFAULT BY PURCHASER HEREUNDER BECAUSE OF THE DIFFICULTY, INCONVENIENCE AND UNCERTAINTY OF ASCERTAINING ACTUAL DAMAGES FOR SUCH DEFAULT.   SELLER AND PURCHASER HEREBY DIRECT THE TITLE COMPANY TO PAY SELLER THE EARNEST MONEY UPON OCCURRENCE OF THE FOREGOING.

## ARTICLE X
### Miscellaneous

10.1     Casualty Loss. Prior to the Closing, risk of loss with regard to the Property shall be borne by Seller. If the Improvements or any of the Personal Property are damaged or destroyed prior to Closing, then:

(a)      If the cost of repairing such damage is less than or equal to $250,000.00, as determined by an architect selected by Purchaser, who is reasonably acceptable to Seller, then, at Seller's option [such election to be made in writing within thirty (30) days of such event]: (i) Seller shall repair such damage as promptly as is reasonably possible, restoring the damaged property at least to its condition immediately prior to such damage, and, in the event such repairs have not been completed prior to Closing, then the Closing nevertheless shall proceed as scheduled, and Purchaser may direct the Title Company to withhold from Seller in an escrow account the funds necessary to make such repairs until Seller has repaired such damage pursuant to the provisions hereof, at which time such funds shall be distributed to Seller, or (ii) Seller shall assign to Purchaser all insurance proceeds payable with respect to such damage, and Purchaser shall receive a cash credit against the Purchase Price for the amount of the deductible under Seller's insurance policy, and for the amount by which the estimated costs of repair exceed the estimated insurance proceeds, and Purchaser shall be obligated to proceed to purchase the Property in accordance with the terms hereof; or

(b)      If the cost of repairing such damage is greater than $250,000.00, as determined by an architect selected by Seller, who is reasonably acceptable to Purchaser, then, at Purchaser's option [such election to be made in writing within thirty (30) days of such event]: (i) Purchaser may elect to terminate this Contract by written notice to Seller, which shall be a Permitted Termination as provided in Section 9.1 hereof; (ii) Seller shall, at Seller's sole expense, repair the damages promptly as is reasonably possible, restoring the damaged property at least to its condition immediately prior to the damage, and the Closing hereunder shall be deferred until such repairs are made; or (iii) Seller shall assign to Purchaser all insurance proceeds payable with respect to such damage, and Purchaser shall receive a cash credit against the Purchase Price for the amount of the deductible under Seller's insurance policy, and for the amount by which the estimated costs of repair exceed the estimated insurance proceeds, and the sale shall be closed without Seller's repairing such damage.  If Purchaser does not make an election, by delivery of written notice thereof to Seller with such thirty (30) day period, Purchaser shall be deemed to have elected the terms of subsection (iii).

10.2    Condemnation.  If, prior to the Closing, condemnation proceedings are threatened or commenced with respect to any portion of the Real Property and Improvements, which materially affects its use, Purchaser may terminate this Contract by delivering a written termination notice to Seller on or prior to the Closing Date, which shall be a Permitted Termination as provided in Section 9.1 hereof.  Prior to Purchaser's termination of this Contract, or if Purchaser does not terminate this Contract, both Seller and Purchaser, by and through their respective attorneys, shall have the right to appear in such condemnation proceedings and defend their interests in the Real Property and Improvements.  Any award in condemnation made prior to the Closing shall become the property of Seller, and the Purchase Price shall be reduced by the amount of the gross condemnation award made to Seller.  An award in condemnation after the Closing shall be the property of Purchaser, and the Purchase Price shall not be reduced thereby.

10.3   <u>Brokerage Commissions</u>.  Seller shall be solely responsible for and shall pay a real estate commission (the "Commission") of six percent (6%) of the gross purchase price to Augenbaum Realty Corp. c/o  Bernie Setton (the "Broker") at Closing, subject to approval by the Bankruptcy Court. Seller, Purchaser, and Broker acknowledge that the commission is subject to approval of the Bankruptcy Court, and Seller agrees to seek approval of the commission as part of the sale approve process and in connection with the Sale Motion.  The Commission shall be payable only if, as and when the Closing occurs, and the Broker shall not have any right to receive any portion of the Earnest Money should the sales transaction contemplated by this Contract terminate. Except for the Broker, each party represents to the other that it has not authorized any broker or finder to act on its behalf in connection with the sale and purchase transaction contemplated hereby and that it has not dealt with any broker or finder purporting to act for any other party.  Each party agrees to indemnify, defend and hold harmless the other party from and against any and all liabilities, costs, damages and expenses of any kind or character arising from any claims for brokerage or finder's fees, commissions or other similar fees in connection with the transactions covered by this Contract insofar as such claims shall be based upon alleged arrangements or agreements made by such party or on its behalf; which indemnity shall (notwithstanding anything to the contrary contained or implied elsewhere in this Contract) expressly survive any termination or Closing of this Contract.  Without limitation, the Texas Real Estate License Act requires written notice to Purchaser that Purchaser should have an attorney examine an abstract of title to the Property or else obtain a title insurance policy.  Notice to that effect is, therefore, hereby given to Purchaser.

10.4   <u>Notices</u>.  Any notices, consents or other communications required or permitted to be given pursuant to this Contract must be in writing and shall be sent to the address set forth below (or such other address as the party might hereafter designate for itself by notice to the other parties as required hereby).  Any such notice or communication shall be sufficient if sent by registered or certified mail, return receipt requested, postage pre-paid; by hand delivery; or by reputable nationwide overnight courier service (e.g., FedEx).  Any such notice or communication shall be effective on (a) the date of receipt if delivered personally; (b) three (3) business days after deposit in an official depository under the regular care and custody of the United States Postal Service, if transmitted by registered or certified mail, return receipt requested; or (c) the first business day after the date of deposit, if transmitted by reputable nationwide overnight courier service (e.g., FedEx).

If to Seller:                          1Nonly Phimar LLC
                                       Phimars Square LLC
                                       Attn: Philip Levine
                                       8330 Lyndon B. Johnson Fwy
                                       Suite B1180
                                       Dallas, TX 75243
                                       Email: _____

With copy to:                          Spencer Fane, LLP
                                       Attn: Jason P. Kathman
                                       5700 Granite Parkway, Suite 650

Plano, TX 75024
Email: jkathman@spencerfane.com

If to Purchaser:   AIDS Healthcare Foundation
c/o Conrad V. Sison
6255 Sunset Blvd., 21st Fl.
Los Angeles, CA 90028 USA
Email: conrad.sison@ahf.org

If to Title Company:  Chicago Title
Attn: Derek Long
5950 Sherry Lane, Suite 220
Dallas, Texas 75225
Email: Derek@ChicagoTitleCo.com

10.5 <u>Applicable Law</u>.  This Contract shall be governed by and construed in accordance with the laws of the State of Texas.  This Contract is performable, and exclusive venue for any action hereunder shall be in Dallas County, Texas.

10.6 <u>Entire Agreement; Modifications</u>.  This Contract embodies and constitutes the entire understanding between the parties with respect to the transactions contemplated herein, and all prior or contemporaneous agreements, understandings, representations and statements (oral or written) are merged into this Contract.  Neither this Contract nor any provision hereof may be waived, modified, amended, discharged or terminated except by an instrument in writing signed by the party against whom the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument.

10.7 <u>Counterpart Execution</u>.  This Contract may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document.  Any signature to this Contract transmitted by facsimile transmission, by electronic mail in portable document format (".pdf") form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document (including, without limitation, via electronic signature through DocuSign, RightSignature or AdobeSign), will have the same force and effect as physical execution and delivery of the paper document bearing the original signature.

10.8 <u>Captions; Construction</u>.  The captions which have been used throughout this Contract have been inserted for convenience of reference only and do not constitute matter to be construed in interpreting this Contract.  Words of any gender used in this Contract shall be held and construed to include any other gender and words in the singular number shall be held to include the plural, and vice versa, unless the context requires otherwise.  The words "herein," "hereof," "hereunder," and other similar compounds of the words "here" when used in this Contract shall refer to the entire Contract and not to any particular provision or section.

10.9 <u>Time is of the Essence</u>.  With respect to all provisions of this Contract, time is of the essence; provided, however, if the final date of any period set forth herein (including, but not

limited to, the Closing Date) falls on a Saturday, Sunday or legal holiday under the laws of the State of Texas or the United States of America, the final date of such period shall be extended to the next day that is not a Saturday, Sunday or legal holiday.  The term "days" as used herein shall mean calendar days.  The term "business days" as used herein shall mean calendar days except Saturdays, Sundays or legal holidays under the laws of the State of Texas, or the United States of America.

10.10    Invalid Provisions.  If any term, provision, condition or covenant of this Contract or the application thereof to any party or circumstance shall, to the extent, be held invalid or unenforceable, the remainder of this Contract, or the application of such term, provision, condition or covenant to persons or circumstances other than those as to whom or which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Contract shall be valid and enforceable to the fullest extent permitted by law, and said invalid or unenforceable term, provision, condition or covenant shall be substituted by a term, provision, condition or covenant as near in substance as may be valid and enforceable.

10.11    Binding Effect.  Purchaser shall be entitled to assign its rights under this Contract to a third party single purpose entity in which Purchaser or its principals hold a controlling majority ownership interest.  Subject to the foregoing, this Contract shall be binding upon and inure to the benefit of Seller and Purchaser, and their respective heirs, personal representatives, successors and permitted assigns.  Except as expressly provided herein, nothing in this Contract is intended to confer on any person, other than the parties hereto and their respective heirs, personal representatives, successors and permitted assigns, any rights or remedies under or by reason of this Contract.

10.12    Further Acts.  In addition to the acts recited in this Contract to be performed by Seller and Purchaser, Seller and Purchaser agree to perform or cause to be performed at the Closing or after the Closing any and all such further acts as may be reasonably necessary to consummate the transactions contemplated hereby.

10.13    Exhibits.  All references to Exhibits contained herein are references to Exhibits attached hereto, all of which are made a part hereof for all purposes the same as if set forth herein verbatim, it being expressly understood that if any Exhibit attached hereto which is to be executed and delivered at Closing contains blanks, the same shall be completed correctly and in accordance with the terms and provisions contained herein and as contemplated herein prior to or at the time of execution and delivery thereof.

10.14    Date of Contract.  All references to the "date of this Contract" or similar references as used herein shall be deemed to mean the date, whichever is latest, that this Contract has been fully executed by Seller and Purchaser, as indicated by their signatures below, and delivered to and acknowledged by the Title Company.

10.15    Attorneys' Fees.  If either party shall be required to employ an attorney to enforce or define the rights of such party hereunder, the prevailing party shall be entitled to recover reasonable attorneys' fees and costs of suit from the losing party, and the losing party agrees to pay such fees and costs upon demand.

10.16  <u>Offer and Acceptance</u>.  If this Contract is executed first by Purchaser and then delivered to Seller, it shall be construed as an offer to purchase the Property from Seller by Purchaser on the terms and conditions, and for the Purchase Price stated herein.  If executed first by Seller and then delivered to Purchaser, it shall constitute an offer to sell the Property to Purchaser by Seller on the terms and conditions and for the Purchase Price stated herein.

10.17  <u>Tax-Deferred Exchange</u>.  Seller or Purchaser may elect to participate in a tax-deferred exchange under Section 1031 of the Internal Revenue Code, in connection with this transaction, and each party agrees to reasonably cooperate with the other in connection with the same; provided, that (i) the exchanging party shall pay all costs and expenses incurred in connection with such exchange (other than the cost, if applicable, for the other party's attorney to review the exchange documents on such party's behalf); (ii) the cooperating party shall not be required to take title to any property other than the Property; (iii) the cooperating party shall not be required to incur any costs, expenses or liabilities in connection therewith (other than any liability which such party would have otherwise incurred under this Contract); and (iv) the Closing shall not be delayed as a result of such tax-deferred exchange.

{Signature Page to Follow}

IN WITNESS WHEREOF, the undersigned have set their hands.

SELLER:

1Nonly Phimar LLC                                    Phimars Square LLC


By: _____          By: _____
Name: Philip Levine                             Name: Philip Levine
Title:  Manager                                      Title:  Manager
Date: _____        Date: _____



PURCHASER:

AIDS Healthcare Foundation, Inc.


By: _____
Name: _____
Title:  _____
Date: _____

## RECEIPT OF EARNEST MONEY
## AND AGREEMENT OF TITLE COMPANY

Chicago Title (the "Title Company") hereby acknowledges the receipt of the following:

      (i)        one (1) fully signed and executed copy of this Contract; and

      (ii)      the Earnest Money in the amount of $1,000,000.00

The Title Company hereby agrees to hold the Earnest Money as contemplated by this Contract and to dispose of it in strict accordance with the terms and provisions of this Contract.

Chicago Title

By: _____

Name: _____

Title: _____

Date: _____